**Slip Op. 10-28**

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————

UNITED STATES STEEL CORPORATION,            :

                *Plaintiff*,            :

      v.            :

UNITED STATES,            :

                *Defendant*,            :          Court No. 07-00133

                                            **PUBLIC**

    and            :

POHANG IRON & STEEL COMPANY, LTD.            :
and POHANG COATED STEEL COMPANY, LTD.,

                     :

            *Defendant-Intervenors*.

—————————————————————

[Denying Plaintiff's Motion for Judgment on the Agency Record, and sustaining U.S. Department of Commerce's final determination in administrative review of antidumping duty order.]

Dated:  March 19, 2010

    Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, Jeffrey D. Gerrish, and Jared R. Wessel), for Plaintiff United States Steel Corporation.

    Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (David F. D'Alessandris); Jonathan M. Zielinski, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

    Akin Gump Strauss Hauer & Feld LLP (Spencer S. Griffith, J. David Park, Jarrod M. Goldfeder, and Lisa W. Ross), for Defendant-Intervenors Pohang Iron & Steel Company, Ltd. and Pohang Coated Steel Company, Ltd.

# OPINION

RIDGWAY, Judge:

In this action, Plaintiff United States Steel Corporation ("U.S. Steel") – a domestic steel producer – contests the Final Results of the U.S. Department of Commerce's twelfth administrative review of the antidumping duty order covering corrosion-resistant carbon steel from the Republic of Korea ("Korea"). *See* Notice of Final Results of the Twelfth Administrative Review of the Antidumping Duty Order on Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 72 Fed. Reg. 13,086 (March 20, 2007) ("Final Results")[1]; Issues and Decisions for the Final Results of the Twelfth Administrative Review of the Antidumping Duty Order on Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea (2004-2005) (March 12, 2007) (Pub. Doc. No. 232) ("Decision Memorandum").[2]

Pending before the Court is Plaintiff's Motion for Judgment on the Agency Record, in which U.S. Steel challenges the methodology for calculating the U.S. indirect selling expenses ("indirect selling expenses" or "ISEs") that Commerce used in the Final Results for Pohang Iron & Steel

---

[1]Commerce's Final Results were amended to correct a ministerial error in the calculation of the dumping margin for Union Steel Manufacturing Co., Ltd. *See* Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea; Notice of Amended Final Results of the Twelfth Administrative Review, 72 Fed. Reg. 20,815, 20,816 (April 26, 2007).

[2]Because the administrative record in this action includes confidential information, two versions of that record were filed with the Court. Documents in the public version of the administrative record are numbered sequentially, and are cited herein as "Pub. Doc. No. ____." Documents in the confidential version of the administrative record are also numbered sequentially, but differently from the public version, and are cited herein as "Conf. Doc. No. ____." The public version of the administrative record consists of copies of all documents in the record, with all confidential information redacted. The confidential version of the record consists of complete, un-redacted copies of only those documents that include confidential information.

Company, Ltd. and Pohang Coated Steel Company, Ltd. (collectively, "POSCO"), foreign manufacturers/exporters of the subject merchandise. *See generally* Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record under Rule 56.2 ("Pl.'s Brief"); Reply Brief in Support of Motion for Judgment on the Agency Record Filed by Plaintiff United States Steel Corporation ("Pl.'s Reply Brief"). Specifically, U.S. Steel contends that Commerce erred by calculating indirect selling expenses using the "payroll methodology" (an alternative methodology proposed by POSCO), rather than using Commerce's default methodology, known as the "relative sales value methodology." *See* Pl.'s Brief at 1, 7-8, 19; Pl.'s Reply Brief at 1-3, 15.[3]

U.S. Steel's motion is opposed by the Government, which maintains that Commerce's allocation of indirect selling expenses in the Final Results was both based on substantial evidence and otherwise in accordance with law. The Government therefore urges that U.S. Steel's motion be denied, and that Commerce's Final Results be sustained in all respects. *See generally* Defendant's Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record and Appendix ("Def.'s Brief").

The Defendant-Intervenors – collectively, POSCO – also oppose U.S. Steel's motion. Like the Government, POSCO asserts that Commerce's treatment of its indirect selling expenses was based on substantial evidence and otherwise in accordance with law, and that the agency's Final Results should be sustained in all respects. *See generally* Memorandum of Defendant-Intervenors,

---

[3]As originally filed, U.S. Steel's Complaint was not limited to POSCO. U.S. Steel also challenged Commerce's calculation of the indirect selling expense ratio as to Union Steel Manufacturing Company, Ltd. *See* Complaint, Count II. However, U.S. Steel subsequently dismissed its Complaint as to Union Steel. *See* Order of Dismissal in Part (Jan. 22, 2008).

POSCO and POCOS, in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency

Record ("POSCO Brief").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[4] For the reasons detailed below, U.S.

Steel's Motion for Judgment on the Agency Record must be denied.

## I. Background

U.S. antidumping laws require that antidumping duties be imposed upon imported

merchandise that "is being, or is likely to be, sold in the United States at less than fair value . . . ,"

and results in material injury or the threat of material injury to a domestic industry. *See* 19 U.S.C.

§ 1673. The antidumping duty is equal to the "amount by which the normal value exceeds the

export price ["EP"] (or constructed export price ["CEP"]) for the merchandise." *Id*. Normal value

is defined as "the price at which the foreign like product is first sold . . . in the exporting country .

. . . " *See* 19 U.S.C. § 1677b(a)(1)(B)(i). When normal value exceeds the price at which the

merchandise is first sold to an unaffiliated purchaser in the United States, a sale is considered

"dumped."

This case involves Commerce's calculation of the constructed export price ("CEP"), which

is the first sale by a seller affiliated with the producer to an unaffiliated purchaser in the United

States. *See* 19 U.S.C. § 1677a(b). The statute requires Commerce to adjust the reported constructed

export price, in order to properly assess the amount by which normal value exceeds that price. *See*

19 U.S.C. §§ 1673, 1677a(c), 1677a(d)(1). Adjustments are necessary because the reported prices

---

[4]All citations to federal statutes are to the 2000 edition of the United States Code. Similarly, all citations to federal regulations are to the 2005 edition of the Code of Federal Regulations.

"represent prices in different markets affected by a variety of differences in the chain of commerce

. . . ," and must be adjusted to "reconstruct the price at a specific, 'common' point in the chain of

commerce, so that value can be fairly compared on an equivalent basis." *See* SKF USA Inc. v. INA

Walzlager Schaeffler KG, 180 F.3d 1370, 1373 (Fed. Cir. 1999) (*citing* Smith-Corona Group v.

United States, 713 F.2d 1568, 1572-73 (Fed. Cir. 1983)).  The adjustments thus permit an "apples-

to-apples" comparison between the price of the subject merchandise sold in the United States and

the price of the foreign like product sold in the home market.

### A.  Overview of Indirect Selling Expenses

Among the adjustments that Commerce must make to the constructed export price is the

deduction of "U.S. indirect selling expenses" ("indirect selling expenses" or "ISEs"), which are the

focus of U.S. Steel's challenge to the Final Results at issue here.  *See* 19 U.S.C. § 1677a(d)(1)(D).[5]

---

[5]Specifically, read in context, 19 U.S.C. § 1677a(d)(1)(D) provides:

(d) Additional adjustments to constructed export price

*For purposes of this section, the price used to establish constructed export price shall also be reduced by –*
      (1)  the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added) –
          (A) commissions for selling the subject merchandise in the United States;
          (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
          (C) any selling expenses that the seller pays on behalf of the purchaser; and
          (D) *any selling expenses not deducted under*

Indirect selling expenses are those expenses incurred by a respondent (or, as in this case, a respondent's U.S. affiliate) which are related to the sale of subject merchandise but which cannot be directly tied to any particular sale – in other words, expenses that "would be incurred by the seller regardless of whether the particular sales in question are made," including common expenses such as rent payments, and telephone charges that a company incurs in selling subject merchandise but which cannot be directly connected to a specific sale.  *See* Koenig & Bauer-Albert AG v. United States, 22 CIT 574, 580, 15 F. Supp. 2d 834, 843 (1998), *aff'd in part*, *rev'd on other grounds*, 259 F.3d 1341 (Fed. Cir. 2001); Antidumping Manual, Glossary of Terms (Dept. of Commerce Oct. 13, 2009) (noting that "[c]ommon examples of indirect selling expenses include inventory carrying costs, salesmen's salaries, and product liability insurance."); *see generally* Pl.'s Brief at 2, 9; Def.'s Brief at 8.

For example, companies typically do not calculate an amount of office rent based on how much rent was incurred in making any particular sale.  Instead, companies generally report to Commerce the total amount of rent paid during the relevant period.  In order to account for rent incurred in selling subject merchandise (so that an appropriate sum can be included in the agency's

---

*subparagraph* (*A*), (*B*), or (*C*).

19 U.S.C. § 1677a(d) (emphases added).

*See* Statement of Administrative Action, H.R. Doc. No. 103-316, at 824 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4164 ("SAA") (stating that 19 U.S.C. § 1677a(d)(1)(D) "provides for the deduction of indirect selling expenses"); *see also* 19 U.S.C. § 3512(d) (setting forth Congress' intent that Statement of Administrative Action is to be "regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements] Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

antidumping calculations), Commerce must allocate to sales of subject merchandise a portion of the total rent paid by the company. In doing so, Commerce must allocate the total rent (as well as other total indirect selling expenses) between the company's sales of subject merchandise and the company's other activities, including sales of non-subject merchandise. Indirect selling expenses may also include, for instance, salaries paid to employees who sell subject merchandise, since salaries normally are paid without regard to whether the employees sell subject merchandise or non-subject merchandise, or – for that matter – whether the employees actually sell any merchandise at all, during the relevant period. *See generally* Pl.'s Brief at 2; Def.'s Brief at 8-9; Transcript of Oral Argument ("Tr.") at 16.

The antidumping statute directs that, in calculating net U.S. prices using the CEP price methodology, Commerce is to deduct "any . . . expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added) . . . . " *See* 19 U.S.C. § 1677a(d); *see also id*. at § 1677a(d)(1)(D). Thus, the statute includes a general provision for the deduction of selling expenses in the CEP price calculation, but is entirely silent as to *how* Commerce is to calculate those expenses (including indirect selling expenses).

Commerce's regulations similarly include general provisions concerning the calculation of expenses. *See* 19 C.F.R. § 351.401(g). Commerce's stated preference is for the calculation of expenses on a transaction-specific basis. *See* 19 C.F.R. § 351.401(g)(1). However, where expenses cannot be ascertained on a transaction-specific basis, the agency's regulations permit expenses (including indirect selling expenses) to be allocated, provided, first, that the allocation is on "as

specific a basis" as possible, and, second, that the methodology "does not cause inaccuracies or

distortions":

>        (1) In general. The Secretary may consider allocated expenses and price
> adjustments when transaction-specific reporting is not feasible, provided the
> Secretary is satisfied *the allocation method used does not cause inaccuracies or*
> *distortions*.
>
>        (2) Reporting allocated expenses and price adjustments. Any party seeking
> to report an expense or a price adjustment on an allocated basis must demonstrate to
> the Secretary's satisfaction that the allocation is *calculated on as specific a basis as*
> *is feasible*, and must explain why *the allocation methodology used does not cause*
> *inaccuracies or distortions*.

19 C.F.R. § 351.401(g) (emphases added)[6]; *see also* 19 U.S.C. § 1677a(d)(1)(D).[7] Like the statute,

Commerce's regulations are entirely silent as to *how* Commerce is to calculate indirect selling

expenses. *See* NSK Ltd. v. United States, 29 CIT 1, 17-18, 358 F. Supp. 2d 1276, 1290-91 (2005),

*aff'd*, 162 Fed. Appx. 982 (Fed. Cir. 2006).

Under these circumstances, Chevron accords Commerce great discretion as to the

methodology used in the calculation of indirect selling expenses. *See generally* Chevron U.S.A.,

---

[6]In promulgating its regulations, Commerce cited language in the Statement of Administrative Action ("SAA") that instructs the agency to permit companies to allocate direct selling expenses when transaction-specific reporting is not possible, provided that the allocation method used does not result in inaccuracies or distortions. *See* Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. 27,296, 27,346 (May 19, 1997) (Preamble) (*quoting* Statement of Administrative Action). Although the statement in the SAA focused on *direct* selling expenses, Commerce found no reason to distinguish between direct selling expenses and other types of selling expenses (*e.g.*, indirect selling expenses) for purposes of the stated principle. The agency therefore extended the principle to *indirect* selling expenses by regulation. *Id*.; 19 C.F.R. § 351.401(g).

[7]Commerce's regulations further provide that the agency will not reject a method for the allocation of indirect selling expenses merely because the method may include expenses incurred in connection with the sale of non-subject merchandise. *See* 19 C.F.R. § 351.401(g)(4).

Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984); *see also* section II,

*infra*. Indeed, this court has previously underscored – in the context of calculating indirect selling

expenses – that "[b]oth 19 U.S.C. § 1677a(d), the relevant statute, and the regulation, 19 C.F.R. §

351.401(g), give little direction on allocation methodology, and thus *Commerce enjoys discretion*

*in choosing its methodology*." *See* NSK, 29 CIT at 17-18, 358 F. Supp. 2d at 1291 (emphasis added)

(*citing* Timken Co. v. United States, 26 CIT 590, 598-99, 209 F. Supp. 2d 1373, 1381 (2002); NSK

Ltd. v. United States, 27 CIT 56, 109-110, 245 F. Supp. 2d 1335, 1378-79 (2003)). Moreover, in

light of Commerce's broad discretion in calculating indirect selling expenses, this court has observed

that it "must accept Commerce's methodology if that methodology is reasonable." *See* Koenig &

Bauer-Albert AG, 22 CIT at 580, 15 F. Supp. 2d at 843.

In the exercise of its ample discretion, Commerce has developed a standard, baseline practice

known as the "relative sales value methodology," which calculates indirect selling expenses by using

the ratio of sales of subject merchandise to total sales. *See* Micron Technology, Inc. v. United

States, 23 CIT 55, 61, 44 F. Supp. 2d 216, 222 (1999) (noting that Commerce "typically . . . requires

indirect selling expenses to be allocated on a sales value basis"). Specifically, under this default

methodology, Commerce calculates the ratio of subject merchandise sales to total sales, and then

applies that ratio to the total indirect selling expenses reported for the period at issue, to calculate

the indirect sales expenses attributable to sales of subject merchandise. Thus, for example, if sales

of subject merchandise constitute half of the value of a company's total sales for the period of

review, then – under the relative sales value methodology – half of the company's indirect selling

expenses are allocated to sales of subject merchandise. *See generally* Pl.'s Brief at 4-5 & n.2; Def.'s

Brief at 9; Pl.'s Reply Brief at 1 n.1.

As even U.S. Steel concedes, however, "it is not [Commerce's] policy to require allocation

of indirect selling expenses based upon relative sales value in every instance." *See* Dynamic

Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea;

Final Results of Antidumping Duty Administrative Review, 61 Fed. Reg. 20,216, 20,217 (May 6,

1996); *see also* Pl.'s Brief at 11; Pl.'s Reply Brief at 3-4. Commerce has broad discretion to use a

different methodology where the agency determines that the alternative methodology is reasonable

and non-distortive. *See* NSK, 27 CIT at 109-10, 245 F. Supp. 2d at 1378-79; *see also* 19 U.S.C. §

351.401(g). Exercising its discretion, Commerce permits respondents that are calculating indirect

selling expenses to segregate expenses that can be demonstrated to be unrelated to the sales of

subject merchandise. *See* Def.'s Brief at 4-5.


B.  The Facts of This Case

In reporting its data for the period covered by the administrative review here at issue (in

response to Commerce's original questionnaire, as well as two supplemental questionnaires),

POSCO proposed that Commerce use an alternative methodology – the "payroll methodology" –

to allocate the indirect selling expenses incurred by POSCO's U.S. sales affiliate, POSCO American

Corporation ("POSAM"), in re-selling to unaffiliated U.S. customers subject merchandise that

POSAM had purchased from POSCO. Specifically, POSCO used payroll data to divide POSAM's

payroll expenses and other common expenses into the three distinct categories of POSAM's activity

during the relevant period:  (1) POSAM's sales of subject merchandise (purchased from POSCO);

(2) POSAM's sales of non-subject merchandise; and (3) POSAM's non-sales-related activity (in particular, POSAM's management of two subsidiaries). *See generally* POSCO Brief at 2, 13, 15-16; *see also* Pl.'s Brief at 2-3; Def.'s Brief at 3, 11-13; Tr. at 19.

For purposes of calculating the indirect selling expenses ratio, POSCO first identified the actual payroll expenses of each of the POSAM employees engaged in each of the three categories of POSAM's activity.[8] POSCO then allocated POSAM's common expenses – rent, depreciation, travel, etc. – to each of the three categories in direct proportion to the percentage of the total actual payroll expenses expended on each category. Finally, POSCO identified the sales revenue for the period of review for each of the three categories of activity. *See generally* POSCO Brief at 3, 13, 15-16; *see also* Pl.'s Brief at 2-4; Def.'s Brief at 3, 9-10, 11-13; Pl.'s Reply Brief at 1 n.1.

In calculating the indirect selling expenses ratio, POSCO included only those expenses and sales revenues associated with the first category of activity (*i.e.*, POSAM's sales of subject merchandise). POSCO reasoned that the calculation of indirect selling expenses is – by definition – intended to capture expenses related to *sales* of *subject merchandise*. POSCO therefore excluded expenses related to the second category of POSAM's activity (*i.e.*, sales of non-subject merchandise), because those expenses did not concern sales of *subject merchandise*. And POSCO excluded expenses related to the third category of POSAM's activity (*i.e.*, POSAM's management

---

[8]POSAM has a "very, very small" workforce – a total of only [  ] employees. *See* Tr. at 24-25. [  ] of the [ ] individuals sold exclusively subject merchandise, [            ] sold both subject and non-subject merchandise, [   ] individuals were dedicated to sales of non-subject merchandise, one individual (referred to as the "investment manager") was responsible for managing two POSAM subsidiaries, [  ] executives were responsible for oversight and management of the operations of the company as a whole, and [    ] general administrative personnel provided support services for the company. *See* Tr. at 16, 20, 50, 55-57, 82; Pl.'s Brief at 3 n.1.

of its investments), because those expenses concerned a non-selling activity, and thus did not

concern *sales* of any merchandise (subject or not).  Using this methodology, POSCO derived an

indirect selling ratio, which it then applied to the reported gross unit prices to calculate the per-unit

indirect selling expenses which POSCO reported to Commerce.  *See generally* POSCO Brief at 3,

10-11; *see also* Pl.'s Brief at 4-5; Def.'s Brief at 3, 9-11; Pl.'s Reply Brief at 1 n.1.

In the Preliminary Results, Commerce did not use the payroll methodology that POSCO

advocated, because – at that early stage of the proceedings – the agency was unsure of the accuracy

of POSCO's proposed methodology.  *See* Def.'s Brief at 3-4, 11.  Instead, Commerce used the

agency's default "relative sales value methodology," dividing POSAM's *company-wide* payroll and

other common expenses by POSAM's *total sales revenue* for the period of review, and thus deriving

a higher indirect selling expenses ratio than that which POSCO had calculated using its proposed

payroll methodology.[9]  Commerce calculated an overall dumping margin of 0.48% for POSCO in

the Preliminary Results.  *See* Certain Corrosion-Resistant Carbon Steel Flat Products from the

Republic of Korea: Notice of Preliminary Results of Antidumping Duty Administrative Review, 71

Fed. Reg. 53,370, 53,376 (Sept. 11, 2006) ("Preliminary Results").

In the briefing that followed Commerce's issuance of the Preliminary Results, POSCO

further explained, in detail, the basis for its proposed payroll methodology.  With the benefit of that

further explanation, as well as additional time to analyze POSCO's proposed methodology,

Commerce determined that the evidence supported POSCO's claims, and therefore concluded that

---

[9]While POSCO's proposed payroll methodology yielded an indirect selling expenses ratio
of [      ]%, Commerce's application of the relative sales value methodology in the Preliminary
Results produced a ratio of [       ]%.  *See* POSCO Brief at 3; Pl.'s Reply Brief at 5.

POSCO's proposed methodology was reasonable, accurate and not distortive, given the specific facts of this case. *See* Def.'s Brief at 3-4, 11-13. Accordingly, Commerce calculated its Final Results using the indirect selling expenses ratio derived from POSCO's payroll methodology. Commerce explained:

> In the Preliminary Results, we recalculated the POSCO Group's [indirect selling expenses] because the POSCO Group had not adequately explained the basis for its exclusion of certain expenses in its reported [indirect selling expenses] calculation. Specifically, we recalculated the POSCO Group's [indirect selling expenses] by including all indirect selling expenses incurred in the United States, including expenses related to POSAM's sales of non-subject merchandise and its non-selling activities during the [Period of Review]. However, *the POSCO Group provided evidence showing that the POSCO Group correctly calculated its* [*indirect selling expenses*] *by excluding expenses related to* [1] *POSAM's sales of non-subject merchandise and* [2] *its non-selling activities*. . . . Thus, the Department will change the [dumping] margin program in the final results to reflect the POSCO Group's original [indirect selling expenses] ratio.

Decision Memorandum at 45 (emphasis added) (footnotes omitted). In the Final Results, Commerce recalculated POSCO's dumping margin at 0.35%. *See* Final Results, 72 Fed. Reg. at 13,087; *see also* Decision Memorandum at 44-45.

In the instant action, U.S. Steel challenges Commerce's Final Results solely as to the agency's use of POSCO's payroll methodology to calculate POSAM's indirect selling expenses.

## II. Standard of Review

A final determination by Commerce in an antidumping case must be sustained, except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009). Substantial evidence is "more than a mere scintilla";

rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (same).

Moreover, any evaluation of the substantiality of evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* Universal Camera, 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same). On the other hand, the mere fact that it may be possible to draw two inconsistent conclusions from evidence in the record does not prevent Commerce's determination from being supported by substantial evidence. *See* Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Further, while Commerce must explain the bases for its decisions, "its explanations do not have to be perfect." NMB Singapore, 557 F.3d at 1319. It is enough that "the path of Commerce's decision" is "reasonably discernable." *Id*.

To determine whether Commerce's interpretation of the antidumping statute is in accordance with law, the two-part test set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) is applied. *See*, *e.g.*, Wheatland Tube Co. v. United States, 495 F.3d 1355, 1359 (Fed. Cir. 2007). The first step of a Chevron analysis requires a determination as to "whether

Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43; *see also* Corus Staal BV v. Dept. of Commerce, 395 F.3d 1343, 1346 (Fed. Cir. 2005). However, "if the statute is silent or ambiguous with respect to the specific issue" in question, the analysis proceeds to Chevron step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843; *see* Wheatland Tube, 495 F.3d at 1359 ("This court reaches step two of Chevron only 'if the statute is silent or ambiguous with respect to the specific issue.'" (*quoting* Chevron, 467 U.S. at 843)).

Under the second step of a Chevron analysis, "[a]ny reasonable construction of the statute is a permissible construction." Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (quotation omitted). "To survive judicial scrutiny, [Commerce's] construction need not be the only reasonable interpretation or even the most reasonable interpretation . . . . Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." Timken, 354 F.3d at 1342 (*quoting* Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (*citing* Zenith Radio Corp. v. United States, 437 U.S. 443, 450 (1978))) (internal quotation marks omitted).

Finally, the Court of Appeals has underscored that, "[i]n recognition of Commerce's expertise in the field of antidumping investigations," Corus Staal, 395 F.3d at 1346, "[d]eference to [the] agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws." Koyo Seiko, 36 F.3d at 1570; *see also* Ta Chen Stainless

Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (emphasizing that Commerce's "special expertise in administering the anti-dumping law entitles its decisions to deference from the courts").

## III. Analysis

In its Motion for Judgment on the Agency Record, U.S. Steel contests Commerce's calculation and allocation of POSAM's indirect selling expenses in the Final Results of the twelfth administrative review of the antidumping duty order covering corrosion-resistant carbon steel flat products from the Republic of Korea. *See* Pl.'s Brief at 1, 8-19; Pl.'s Reply Brief at 1-15.

Although U.S. Steel frames its case in a number of different ways, U.S. Steel contends – in essence – (1) that Commerce erred in excluding POSAM's "investment management" expenses from the pool of indirect selling expenses to be allocated, and (2) that Commerce erred in using POSAM's payroll data – rather than POSAM's sales data – in allocating the company's common expenses. *See*, *e.g.*, Pl.'s Reply Brief at 11; Tr. at 30, 32-34; *see also* POSCO Brief at 6. In addition, U.S. Steel asserts that Commerce impermissibly switched methodologies between prior administrative reviews and the review at issue here, as well as between the Preliminary Results and the Final Results in the instant review. *See* Pl.'s Brief at 5-6, 11-13. Each of U.S. Steel's arguments is analyzed in turn below, and for the reasons detailed there, must be rejected.

Given the particular facts of this case, Commerce's use of the payroll methodology in the Final Results allocated POSAM's indirect selling expenses to sales of subject merchandise on a more specific basis than would have the relative sale value methodology that U.S. Steel advocates.

Commerce's use of the payroll methodology therefore was more consistent with the agency's regulations, which require the allocation of expenses "on as specific a basis as is feasible." 19 C.F.R. § 351.401(g)(2); *see* Def.'s Brief at 18-19; POSCO Brief at 1-2, 13, 18-19; Tr. at 25, 27, 54, 60; *see also* POSCO Brief at 19 (emphasizing that use of relative sales value methodology in this case would have been distortive and inaccurate, because it would have included "expenses associated with sales of *non-subject* merchandise and *non-selling* activities"); *id*. at 13, 17 (same); Def.'s Brief at 19 (same); Tr. at 25-28, 60, 64 (same).

Moreover, the exercise of Commerce's ample discretion may permit it to select from among several reasonable methodologies in a given case. Here, even assuming, *arguendo*, that the relative sales methodology would have been a reasonable choice, Commerce's use of the payroll methodology cannot be said to have been unreasonable, and so must be sustained.

A. U.S. Steel's Claims Contrasting POSAM Data and Commerce's ISE Allocations

U.S. Steel first argues that, "by adopting the payroll methodology in the Final Results, [Commerce] grossly distorted, and thereby *incorrectly* allocated, POSAM's [indirect selling expenses]" ("ISEs"). *See* Pl.'s Brief at 14; *see generally id*. at 13-17; Pl.'s Reply Brief at 2-5. Significantly, U.S. Steel does not contend that any of the data that POSCO submitted are inaccurate. *See* Def.'s Brief at 14. In attempting to prove its case, U.S. Steel does little more than state the results of Commerce's use of POSCO's payroll methodology, compare those results to POSAM's sales or other data, and assert that – *ipso facto* – a distortion exists. *See* Def.'s Brief at 14-15, 16; *see generally* POSCO Brief at 17-19.

U.S. Steel emphasizes, for example, that POSAM's sales of subject merchandise constituted a certain percentage of its total sales, contrasting that figure with the percentage of total indirect selling expenses allocated to sales of subject merchandise, and asserting – with little or no explanation or analysis – that the difference between those two figures illustrates a "gross distortion[]." *See* Pl.'s Brief at 14-15 & Figure 1; *see also id*. at 4; Pl.'s Reply Brief at 2 (asserting that contrast between the two figures alone "shows that the payroll methodology is patently and unlawfully distortive"), 3; Def.'s Brief at 14-15; POSCO Brief at 17.[10] Focusing on the flip side of the same coin, U.S. Steel highlights the fact that POSAM's sales of non-subject merchandise constituted only a certain percentage of its sales – a figure which U.S. Steel contrasts sharply with the percentage of total indirect selling expenses that were allocated to those sales in the Final Results. *See* Pl.'s Brief at 14 & Figure 1; Pl.'s Reply Brief at 3; *see generally* Def.'s Brief at 15; POSCO Brief at 17.[11]

U.S. Steel's attempts to prove distortion simply by pointing to contrasting figures – with no supporting rationale or analysis whatsoever – is not valid legal argument. *See*, *e.g.*, U.S. Ass'n of Imps. of Textiles & Apparel v. United States, 413 F.3d 1344, 1353 (Fed. Cir. 2005) (dismissing party's argument where party failed to "support its assertion . . . with any reasoning, evidence, or

_____

[10]Specifically, the payroll methodology allocated [    ]% of POSAM's total indirect selling expenses to sales of subject merchandise, which accounted for [    ]% of POSAM's total sales. *See* Pl.'s Brief at 4, 14-15 & Figure 1; Pl.'s Reply Brief at 2-3; Def.'s Brief at 15; POSCO Brief at 17.

[11]Specifically, the payroll methodology allocated [    ]% of POSAM's total indirect selling expenses to sales of non-subject merchandise, which accounted for [    ]% of POSAM's total sales. *See* Pl.'s Brief at 14 & Figure 1; Pl.'s Reply Brief at 3; POSCO Brief at 17.

precedent"); Consol. Int'l Automotive v. United States, 16 CIT 1062, 1066, 809 F. Supp. 125, 130 (1992) (rejecting party's argument where party failed to "support its objection to [the agency's] choice other than by conjecture . . .").

Moreover, as to the substantive merits of the matter, U.S. Steel fundamentally fails to appreciate the significance of the percentage of POSAM's total payroll which was paid to the individual who managed POSAM's subsidiaries, together with the fact that those "investment management" activities generated no sales revenue for POSAM, and the fact of the "very, very small" size of POSAM's workforce – factors which, taken together, largely explain the figures that U.S. Steel seeks to contrast and cast as evidence of unlawful "distortion." *See generally* POSCO Brief at 17; *see also id*. at 13-14 (noting that extent to which POSAM's total expenses are attributable to salaries "underscor[es] the significance of personnel activities (as reflected in payroll information) to the [indirect selling expenses] ratio calculation"); *id*. at 15-16 (same); Tr. at 24; *id*. at 24-25 (POSCO explains that "the investment manager[,] while one individual[,] actually represents a fairly significant portion of the total workforce, so when you're hearing about the distortions . . . [and that] there was so much assigned to the investment category, . . . well it's correct because [the] investment manager alone was a significant portion of the work force," and that "[w]hen you understand these contextual aspects, the fact that [POSAM] is not just a sales entity and the fact that it's a fairly small organization, . . . all of [U.S. Steel's] allegations . . . about the so-called distortions . . . just fall away then.").[12] *But see* Pl.'s Reply Brief at 6-9 (responding to

[12]As discussed in note 8 above, POSAM's workforce was "very, very small" – a total of only [  ] employees. *See* Tr. at 24-25, 55-57, 78. Moreover, POSAM's total payroll constituted [  ]% of POSAM's total expenses. *See* POSCO Brief at 13-14, 15. And the salary of POSAM's

POSCO's argument that difference in results between indirect selling expense allocation methodologies is attributable to exclusion of investment management expenses from pool of expenses used to calculate indirect selling expenses).

U.S. Steel insists that POSAM's investment management expenses should have been included in calculating indirect selling expenses. U.S. Steel argues that, like accounting and human resources, "activities [such as investment management] benefit the corporate entity – *i.e.*, POSAM – and properly belong in the pool of [indirect selling expenses] to be allocated." *See* Pl.'s Brief at 12; *see also* Pl.'s Reply Brief at 9; Tr. at 12. U.S. Steel concludes that Commerce "should *not* have excluded POSAM's investment management expenses in the calculation of the company's [indirect selling expenses]," citing Aramide for the proposition that it is Commerce's practice "to *include* [in the calculation of indirect selling expenses] the general and administrative ("G&A") expenses, such as expenses associated with investment management, that are incurred in support of the respondent's U.S. sales affiliate." *See* Pl.'s Reply Brief at 6-7 (*citing* Aramide Maatschappij V.o.F. v. United States, 19 CIT 1094, 1101, 901 F. Supp. 353, 360 (1995)); *see generally id.* at 6-9, 10-11; Pl.'s Brief at 12-13 (*citing* Aramide, and asserting, *inter alia*, that "virtually every company has employees dedicated to 'managing investments'").

U.S. Steel is wrong on both the law and the facts. In Aramide, a parent company provided "various corporate-level administrative support services that at a minimum . . . were indirectly related to . . . [the] selling functions" of the U.S. selling affiliate of a foreign producer. *See* Aramide,

---

"investment manager" constituted [   ]% of POSAM's total payroll. *See* POSCO Brief at 17; Tr. at 58-59, 81.

19 CIT at 1101-02, 901 F. Supp. at 360. Noting that Commerce generally includes G&A expenses incurred by a U.S. selling affiliate in the agency's calculation of indirect selling expenses, the Aramide court sustained Commerce's decision to "include[] a proportionate share of [the administrative, accounting and finance service] expenses in the calculation of [the foreign producer's] indirect selling expenses." *See id*., 19 CIT at 1101, 901 F. Supp. at 360.

U.S. Steel misstates the rule of Aramide, and – in addition – misapplies the decision given the facts of this case. According to U.S. Steel, Aramide requires that "[all] G&A expenses of a respondent's U.S. sales affiliate" be included "in the pool of [indirect selling expenses] to be allocated because they are indirectly related to selling *regardless of their classification by the respondent*." *See* Pl.'s Reply Brief at 8 (emphasis added) (footnote omitted). U.S. Steel therefore concludes that "POSAM's investment management expenses should have been allocated to, rather than excluded from, the pool of [indirect selling expenses] because [*the investment management expenses*] *were indirectly related to selling*." *Id*. (emphasis added).

As a threshold matter, Commerce's exclusion of POSAM's investment management expenses from the agency's calculation of indirect selling expenses was based on the specific, somewhat unusual facts of this case (discussed below) – *not* on the classification of those expenses by the respondent, POSCO. *See* Pl.'s Reply Brief at 8; Tr. at 29 (U.S. Steel argues that treatment of POSAM's "investment management" expenses should not be based on their characterization by POSCO).

Further, Aramide cannot possibly be read as broadly as U.S. Steel suggests, to require that *all* G&A expenses must necessarily be included in the calculation of indirect selling expenses, *in*

*every case*.   Such a reading would inherently conflict with the very concept of "indirect selling

expenses," which implicitly contemplates the exclusion of all expenses that relate to sales of non-

subject merchandise, as well as the exclusion of all non-selling expenses (*i.e.*, all expenses that are

entirely unrelated to sales).   *See generally* Def.'s Brief at 9-11, 18-19; POSCO Brief at 19

(distinguishing between indirect selling expenses associated with sales of subject merchandise

(which should be included in calculating indirect selling expenses) *versus* indirect selling expenses

associated with sales of non-subject merchandise, and indirect selling expenses associated with non-

selling activities (which should be excluded from the calculation of indirect selling expenses)).   As

the Government points out, when "an expense is demonstrated to be unrelated to the sale of subject

merchandise . . . , that expense may be removed from the indirect selling expense calculation."   *See*

Def.'s Brief at 12.[13]

---

[13]*See*, *e.g.*, NSK Ltd. v. United States, 29 CIT at 17-18, 358 F. Supp. 2d at 1291 (upholding
Commerce's decision to exclude selling expenses related to non-subject merchandise from pool of
indirect selling expenses); NSK Ltd. v. United States, 27 CIT at 108-10, 245 F. Supp. 2d at 1378-79
(sustaining Commerce's determination to deduct "certain expenses attributable to non-scope
merchandise" from indirect selling expenses); Timken Co. v. United States, 26 CIT at 596-99, 209
F. Supp. 2d at 1379-81 (upholding Commerce's decision to "exclude certain expenses attributable
to non-scope merchandise" from indirect selling expenses); Issues and Decision Memorandum for
the Antidumping Duty Administrative Reviews of Ball Bearings and Parts Thereof from France,
Germany, Italy, Japan, and the United Kingdom for the Period of Review May 1, 2004, through
April 30, 2005, 2006 WL 1984601 (July 14, 2006), at comment 29 (finding that respondent properly
excluded certain indirect selling expenses attributable to non-subject merchandise); Issues and
Decision Memorandum for the Antidumping Duty Administrative Reviews of Antifriction Bearings
(Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan,
Singapore, and the United Kingdom for the Period of Review May 1, 2002, through April 30, 2003,
2004 WL 3524431 (Sept. 15, 2004), at comment 12 (finding nothing improper about respondent's
exclusion of "the indirect selling expenses . . . that are attributable to non-subject merchandise");
*see also* POSCO Brief at 8-11 (and authorities cited there).

The Government also distinguishes <u>Aramide</u> from this case on its facts. Commerce concluded that the investment management function in this case was totally unrelated to sales of subject merchandise, "in contrast to the situation in <u>Aramide</u> . . . , relied upon by U.S. Steel, where the respondent attempted to remove financial services expenses from the calculation of indirect selling expenses solely because they were 'of a corporate-wide administrative nature.'" *See* Def.'s Brief at 12-13 (*quoting* <u>Aramide</u>, 19 CIT at 1101, 901 F. Supp. at 360).

U.S. Steel disputes Commerce's determination that the investment management function here lacks even an *indirect* relationship to POSAM's sales, and does not belong in the pool of expenses used to calculate the indirect selling expenses ratio. *See generally* Pl.'s Brief at 12-13; Pl.'s Reply Brief at 7, 9, 10-11; Tr. at 11-12, 28-29, 34, 39-40, 66-68, 89-92. However, U.S. Steel has pointed to nothing to cast doubt on the agency's finding that POSAM's investment management function is wholly distinct from POSAM's sales function and does not support or confer a benefit on sales, and thus should be excluded from the calculation of indirect selling expenses (unlike G&A expenses – such as human resources and accounting – which, in fact, do support or benefit sales).

As POSCO explained, and as Commerce concluded, the critical, distinguishing fact here is that POSAM is not only a sales organization. Unlike the typical U.S. selling affiliates in other, similar cases, POSAM comprises two entirely separate and distinct business units, which perform two entirely separate and distinct business functions. *See* POSCO Brief at 2, 11; Tr. at 19, 22, 24, 42-43, 76, 79. POSAM's first business function is its sales function, which involves the sales of subject and non-subject steel products. *See* POSCO Brief at 2, 15; Def.'s Brief at 9, 11; Tr. at 19, 22, 79. POSAM's second, entirely distinct and discrete business function – the so-called

"investment management" function – is devoted exclusively to the management of two POSAM

subsidiaries.  *See* POSCO Brief at 2, 11; Def.'s Brief at 12-13; Pl.'s Brief at 3, 12; Tr. at 19-21, 41,

44, 46-47, 56, 69, 79, 91-92.[14]

POSAM's investment management function provided no conventional "investment

management" services, generated no sales revenue whatsoever, did not – either directly or indirectly

– support POSAM's sales function, and, indeed, had no relationship whatsoever with POSAM's

sales function (direct or indirect), except that the two otherwise separate and distinct business units

shared certain common expenses, including expenses for, *inter alia*, supervisory and administrative

---

[14]*See also* Tr. at 17 (where Government notes that "the characterization as an investment manager is what's causing the confusion here"); *id*. at 19-21 & 46 (where POSCO and Government explain that POSAM's "investment manager" performs a function that is not performed at typical U.S. sales affiliates); *id*. at 20-21 (where POSCO explains that POSAM's "investment management" function is analogous to "a private equity firm which buys companies and has someone who manages [them]"; POSAM's "investment manager" is "not like a day trader sitting at a computer, . . . [and] moving the company's money around to . . . buy stocks and bonds"); *id*. at 41-42 (where Government explains that "[i]f [POSAM's investment manager] were . . . a day trader, . . . if he [was] . . . managing foreign currency trades for the entire corporation or something like that, there's no question that [the "investment management" function here] would be a G&A expense that should be allocated across the company because it would benefit the entire company" – but "what [POSAM's investment manager's] doing is managing solely [the two POSAM subsidiaries]"); *id*. at 46 (where Government explains that POSAM's "investment manager" is "doing . . . the actual management function of these subsidiaries within the U.S.," but that – in a typical case – "investment management" refers to "an overall G&A function that's benefitting the entire corporation because someone being referred to as an investment manager might be managing bank accounts or stock portfolios for the corporation or for a multi-national corporation handling . . . foreign currency exchanges, moving . . . company bonds or company assets between banks in different countries.  Something like that would benefit the sales of subject merchandise and non-subject merchandise and would properly be considered G&A."); *id*. at 56-57 (where POSCO explains that POSAM's investment manager "is not an investment manager who's managing stocks, doing hedge funds, *et cetera*").

support personnel, rent, travel, communications, and depreciation. *See* POSCO Brief at 11-12, 17, 18; Def.'s Brief at 12; Tr. at 19-20, 22-23, 23-24, 26, 41-42, 44, 46, 60, 78, 80, 91-92.

As the Government notes, U.S. Steel is correct that "the managing of a company's investments is an activity that can be included as an indirect selling expense." *See* Def.'s Brief at 12 (*citing* Pl.'s Brief at 12). But the "investment management" function here is a very different animal. And investment management expenses should be excluded from the pool of indirect selling expenses where – as here – the investment management function is "unrelated to *the sale of subject merchandise*." *See* Def.'s Brief at 12 (emphasis added) (*citing* NSK, 29 CIT at 17-18, 358 F. Supp. 2d at 1291) (additional citation omitted).

U.S. Steel claims at one point in its briefs that POSAM's investment management expenses should be included in the pool of indirect selling expenses to be allocated simply because the function "benefit[s] *the corporate entity – i.e.*, POSAM." *See* Pl.'s Brief at 12 (emphasis added). Contrary to U.S. Steel's assertion, however, not every expenditure that may ultimately indirectly benefit or enhance a company's overall "bottom line" is to be included in the calculation of indirect selling expenses. Instead, indirect selling expenses are intended to capture only those expenditures that indirectly support or benefit the function of *sales of subject merchandise*. The function of POSAM's investment manager – who was devoted solely to the management of two POSAM subsidiaries – did not support or benefit POSAM's sales of subject merchandise (or, in fact, any sales at all). POSAM's so-called "investment management" expenses were therefore properly excluded from Commerce's calculation of indirect selling expenses in this case.

In its final challenge to Commerce's exclusion of POSAM's "investment management" expenses in the agency's calculation of indirect selling expenses, U.S. Steel – in the course of oral argument – challenged the sufficiency of the evidence. U.S. Steel contends, in essence, that the record is devoid of evidence to support Commerce's conclusions about the actual function of the investment manager and the absence of any benefit to POSAM's sales function. According to U.S. Steel, there is no evidence here that POSAM's investment management function differs in any way from the investment management functions at typical U.S. selling affiliates in other, similar cases (where investment management expenses are generally treated as part of G&A expenses, and included in the pool of indirect selling expenses for allocation to sales of subject merchandise). *See* Tr. at 11-12, 39-40, 66-68, 89-91; *cf*. Pl.'s Brief at 12-13 (arguing that "virtually every company has employees dedicated to 'managing investments'").

U.S. Steel is simply wrong. The evidence on POSAM's "investment management" function may be somewhat thin, and a bit cryptic. But that evidence is also undisputed, and – under the circumstances – more than sufficient to constitute "substantial evidence" to support Commerce's decision to exclude "investment management" expenses from the pool used to calculate POSAM's indirect selling expenses. *See* POSCO Letter to Commerce (Aug. 4, 2006) (Conf. Doc. No. 74) at 2-5; POSCO First Supplemental Questionnaire Response (May 23, 2006) (Conf. Doc. No. 46) at Exh. 27; POSCO Second Supplemental Questionnaire Response (July 26, 2006) (Conf. Doc. No. 66) at 4-5, Exh. 9 (including POSAM's Organization Chart, Job Descriptions and Legal Structure); POSCO Section C Response (Dec. 2, 2005) (Conf. Doc. No. 11) at Exh. C-18; *see also* Tr. at 41-44, 55-57, 91-92; POSCO Brief at 11-12, 17; Def.'s Brief at 12.

The substantial evidence test "requires only that there be evidence that a reasonable mind might accept as adequate to support a conclusion." *See* Cleo Inc. v. United States, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (*citing* Universal Camera, 340 U.S. at 477). On this record, U.S. Steel cannot show that POSAM's investment manager supported or conferred a benefit on the company's sales of subject merchandise. Commerce's exclusion of POSAM's "investment management" expenses from the calculation of indirect selling expenses therefore was not unreasonable. *See generally* Decision Memorandum at 44-45.

In addition to its criticism of Commerce's exclusion of investment management expenses from the calculation of indirect selling expenses, U.S. Steel also attributes some of the alleged "distortion" to the use of payroll "to allocate [common] expenses that bore no relationship whatsoever to payroll." *See* Tr. at 14; *see also*, *e.g.*, Tr. at 30-31, 33-34. Thus, for example, U.S. Steel contends that – because "activities other than sales of subject merchandise" constituted only a certain percentage of total sales – Commerce erred by allocating to those activities a disproportionate share of the payroll expenses for executive and administrative staff. *See* Pl.'s Brief at 14-15.[15]

But U.S. Steel's analysis is inherently flawed. As discussed above, U.S. Steel ignores the fact that, as Commerce found, POSAM's investment management function generated no sales revenue, and did not even indirectly support or benefit POSAM's sales of merchandise (whether

---

[15]Specifically, Commerce allocated [   ]% of the payroll expenses for POSAM's executives and administrative staff to activities other than sales of subject merchandise (*i.e.*, to sales of non-subject merchandise and to management of POSAM's subsidiaries), which accounted for [   ]% of POSAM's total sales revenue. *See* Pl.'s Brief at 14-15 & Figure 2. *But see* POSCO Brief at 17-18.

subject or not). *See generally* POSCO Brief at 11-12, 17-18; Def.'s Brief at 12; Tr. at 19-20, 22, 26, 44, 46, 91-92. Further, because POSAM's executives and administrative staff support and have responsibility for *all* personnel, Commerce reasonably concluded that it was appropriate to allocate the payroll expenses for executive and administrative personnel in direct proportion to the salaries of the employees that they supervised and/or supported – including those employees who were responsible solely for the sales of non-subject merchandise, as well as the individual devoted exclusively to non-selling ("investment management") activities, who had nothing to do with sales of any merchandise, subject or not. *See* POSCO Brief at 17-18.

U.S. Steel launches similar attacks on Commerce's allocation of assorted other "common expenses." *See generally* Pl.'s Brief at 15-17.[16]    But, again, the payroll methodology began with

---

[16]U.S. Steel targets communication expenses as a particularly "vivid" illustration of the alleged distortion, asserting that it is "inconceivable" that sales of subject merchandise consumed only the allocated percentage of communication expenses, given the magnitude of the contribution of sales of subject merchandise to total sales. *See* Pl.'s Brief at 15 & Figure 2. Specifically, U.S. Steel emphasizes that Commerce allocated "[          ] of total communication expenses" to sales of subject merchandise, which accounted for [   ]% of POSAM's total sales. *See* Pl.'s Brief at 15 & Figure 2. *But see* POSCO Brief at 18.

U.S. Steel further alleges the existence of "significant distortions" in Commerce's allocation of common expenses to sales of non-subject merchandise. *See* Pl.'s Brief at 16-17 & Figures 1-2. Specifically, U.S. Steel points to the fact that Commerce allocated to sales of subject merchandise and to sales of non-subject merchandise common expenses (and communication expenses in particular) which were generally comparable, even though sales of subject merchandise and sales of non-subject merchandise make very different contributions to POSAM's total sales (*i.e.*, [ ]% and [ ]%, respectively). *See* Pl.'s Brief at 16-17 & Figures 1-2; Tr. at 37-38. *But see* POSCO Brief at 18.

Criticizing Commerce's use of the payroll methodology to allocate communication expenses, U.S. Steel emphasizes that, as a matter of pure logic, communications expenses do not necessarily vary in proportion to salaries. *See* Tr. at 65. But it is equally true that, as a matter of pure logic, communications expenses do not necessarily vary in proportion to relative sales value either. *See*

Tr. at 61. Certainly U.S. Steel has not identified even a scintilla of evidence to prove that, in this case, communications expenses increased with the relative value of sales. Thus, as to this point, there would be no advantage to use of the relative sales value methodology that U.S. Steel advocates.

Nor is there any record evidence here to support U.S. Steel's assertion that selling subject merchandise incurs disproportionately higher communications expenses than does selling non-subject merchandise (or, for that matter, managing POSAM's two subsidiaries). *See* Tr. at 54-55, 86-87. U.S. Steel seeks to make much of evidence of frequent communication between POSAM, its U.S. customers, and its corporate parent in Korea concerning sales of subject merchandise. *See* Pl.'s Brief at 15; Tr. at 37-38, 65. But, as the Government points out, nothing about that evidence speaks to the relative volume or expense of communications (*i.e.*, communications with POSCO about sales of subject merchandise *versus* other communications concerning sales of non-subject merchandise). *See* Tr. at 68-69. There is simply no record evidence – one way or the other – as to the comparative expense of communications concerning sales of the two types of merchandise. *See id.*; *see also id.* at 86-87.

Moreover, contrary to U.S. Steel's claims, the mere fact of higher sales value alone does not compel the conclusion that the individuals selling subject merchandise made more or longer telephone calls than the individuals selling non-subject merchandise. *See* Tr. at 63-64. Given that there were equal numbers of POSAM employees selling subject merchandise and non-subject merchandise, U.S. Steel's implication seems to be that one sales group was feverishly working the phones, while – as POSCO puts it – the other sales group played solitaire on their computers every day. *See* Tr. at 63-64, 82-83. Among its several grave flaws, U.S. Steel's theory fails to acknowledge that it is possible to make a very high value sale with a single phone call. *See* Tr. at 52-53, 88-89 (highlighting role of price of merchandise being sold).

U.S. Steel also disputes the reasonableness of the travel and entertainment expenses that Commerce allocated to POSAM's investment manager, as compared to the travel and entertainment expenses allocated to "*the entire sales force* for POSAM's subject merchandise." *See* Pl.'s Brief at 16 (emphasis added); *id.* at Figure 2. Specifically, U.S. Steel notes that Commerce allocated to the investment manager travel and entertainment expenses totaling [            ] the travel and entertainment expenses for that sales force. *See* Pl.'s Brief at 16 & Figure 2. *But see* POSCO Brief at 18.

What U.S. Steel conspicuously fails to note, however, is that "the entire sales force for POSAM's subject merchandise" is [         ] people. *See* Tr. at 61. Thus, distilled to its essence, U.S. Steel's complaint is simply that the payroll methodology allocated *to POSAM's investment manager* a [            ] share of travel and entertainment expenses than was allocated *to* [            ] who sold subject merchandise. Reframed in that fashion, U.S. Steel's claim hardly

the specific assignment of payroll expenses based on the individual responsibilities of POSAM's

personnel. Under these circumstances, it was not unreasonable for Commerce to allocate POSAM's

common expenses (which are not otherwise segregated in the company's normal accounting records)

in direct proportion to the actual activities of each of POSAM's employees. *See* POSCO Brief at

18. U.S. Steel's arguments to the contrary are lacking in merit.

In a typical case, the U.S. sales affiliate is dedicated solely to sales of merchandise (whether

both subject and non-subject merchandise, or subject merchandise alone). *See*, *e.g.*, Tr. at 75. In

such a case, it is generally reasonable to use the relative sales value methodology to allocate indirect

selling expenses to, *inter alia*, sales of subject merchandise. *Id*. at 75-76. But – as discussed herein

– this is not a typical case; so application of the relative sales value methodology here made little

sense.

In this case, the U.S. sales affiliate, POSAM, is also engaged in non-selling activity –

specifically, the management of two POSAM subsidiaries, a function that did not support and

conferred no benefit on POSAM's sales activities. As such, as discussed above, it was necessary

to exclude from the calculation of indirect selling expenses the expenses associated with POSAM's

---

screams "distortion." Further, U.S. Steel cannot dispute that the investment manager incurred travel
and entertainment expenses in connection with his management of POSAM's two subsidiaries. *See*
Tr. at 76. Moreover, it is uncontroverted that the investment manager's salary constituted [ ]% of
POSAM's total payroll. *See* POSCO Brief at 17; Tr. at 58-59, 81. It would seem to be a not
unreasonable assumption that a higher-compensated employee would spend a greater sum on travel
and entertainment. But, in any event, there is no record evidence to indicate that sales of
merchandise (whether subject or not) incurred travel expenses that were disproportionate (either
higher or lower) relative to those incurred in the management of POSAM's subsidiaries. Tr. at 86.
In short, this claim of distortion by U.S. Steel – like its other, similar claims – is neither supported
by evidence nor compelled by logic.

management of its subsidiaries – a non-selling activity.  Those expenses included not only the salary

of POSAM's "investment manager," but also the investment manager's share of the common

expenses for administrative support and other services that he shared with the POSAM sales staff

(who sold subject, as well as non-subject, merchandise).

Commerce had no choice but to use some other methodology to properly account for the

expenses associated with POSAM's non-selling function, because the relative sales methodology

was not designed to do so.  Under the circumstances, it was neither illogical nor unreasonable to

begin with another fact that makes this case somewhat unusual – the fact that POSAM's relatively

small staff and the discrete nature of each staffer's responsibilities made it possible not to *allocate*

(as in the typical case) but, in fact, to *specifically assign* personnel salaries to three categories,

depending on individuals' responsibilities: (1) sales of subject merchandise; (2) sales of non-subject

merchandise; and (3) non-selling activities (*i.e.*, management of POSAM's two subsidiaries).

Commerce then excluded the salaries of those engaged in the sales of non-subject merchandise, as

well as the salary of the "investment manager" who managed POSAM's subsidiaries, because the

activities of those individuals either did not relate to sales of *subject* merchandise or did not relate

to *sales* of merchandise (whether subject or not), and thus were not properly included in the

calculation of the indirect selling expenses ratio for subject merchandise.

The specific assignment of salaries (discussed above) disposed of a significant percentage

of POSAM's total expenses, another somewhat distinctive fact.  What remained to be accounted for

were the "common expenses."  Commerce could not properly treat those common expenses as

though they related exclusively to sales of subject and non-subject merchandise, because they were

shared (*i.e.*, consumed in part) by POSAM's investment manager. To determine the amount of common expenses attributable to the sales of subject merchandise, Commerce had no choice but to determine some means of accounting for the common expenses consumed by the investment manager (as well as the common expenses consumed by those individuals who sold non-subject merchandise). Particularly given the fact of the specificity with which personnel salaries were assigned in this case, it was neither illogical nor unreasonable for Commerce to decide to allocate POSAM's common expenses in accordance with the first step of the process – that is, in proportion to the very specific *assignment* of the salaries of individual POSAM personnel to the company's three activities.

While U.S. Steel criticizes Commerce's use of payroll to allocate common expenses in this case, a certain measure of imprecision is inherent in the allocation process; common expenses are allocated for the very reason that they – by definition – cannot be precisely assigned. Further, it is a fact that a number of major common expenses, such as rent, are fixed. Moreover, as discussed herein, in a number of instances where U.S. Steel argues that some particular common expense does not necessarily vary in proportion to salary, it is equally true that the expense does not necessarily vary relative to sales. The relative sales value methodology that U.S. Steel advocates thus would be no more specific than the payroll methodology that Commerce used. The bottom line is that there is no record evidence here – *none* – to indicate that POSAM's common expenses were incurred in proportion to sales value. *See*, *e.g.*, Tr. at 85. And, even assuming that there were some common expenses that would, logically, necessarily vary in proportion to sales (but not in proportion to payroll) – a matter which is not documented on the evidentiary record – it would nevertheless have

been well within Commerce's discretion to use the payroll methodology, given the specific circumstances of this case. U.S. Steel's objections to Commerce's use of the payroll methodology therefore cannot be sustained.

B. U.S. Steel's Factors Assertedly Used to Evaluate Alternative Methodologies

U.S. Steel maintains that its claims of distortion are supported not only by the specific examples addressed above, but also by three factors which U.S. Steel contends are "normally considered and applied by [Commerce] itself in determining the appropriateness of an alternative allocation methodology." *See* Pl.'s Brief at 17; *see also id*. at 17-18; Pl.'s Reply Brief at 2, 5-14.[17] As set forth below, however, U.S. Steel again fails to show that Commerce's determination was not supported by substantial evidence or was otherwise not in accordance with law.

1. Results of Relative Sales Value Methodology *versus* Alternative Methodology

U.S. Steel points to the "difference in results between the relative sales value methodology and the alternative methodology in question" as one factor that Commerce has considered in the past in determining whether an alternative methodology is distortive. *See* Pl.'s Brief at 17 (*citing* Issues and Decision Memorandum for the Administrative Review of Gray Portland Cement and Clinker From Mexico – August 31, 2001 through July 31, 2002, 2003 WL 24153862 (Sept. 16, 2003)) ("Clinker from Mexico"), at comment 15; *see also* Pl.'s Reply Brief at 2-3, 5-6. U.S. Steel

---

[17]U.S. Steel makes no claim that its asserted factors have been compiled – much less collectively memorialized or codified – anywhere. Instead, U.S. Steel apparently has distilled the three factors itself, from various sources.

characterizes the difference in the results of the two methodologies in this case as "significant." *See* Pl.'s Brief at 17.[18]  But U.S. Steel's argument is not well-taken.

As the Government points out, U.S. Steel does not identify any flaw or error in POSCO's reported data. *See* Def.'s Brief at 15-16.  Nor does U.S. Steel do anything to explain *why* a difference in results between the two methodologies demonstrates distortion – much less why it means that *the payroll methodology* was distortive. *See* Def.'s Brief at 15-16.  Instead, U.S. Steel simply states the ratio that results from each of the two methodologies, and summarily concludes that "the payroll methodology is distortive." *See* Pl.'s Brief at 17.

The Government notes that it should come as no surprise that different methodologies produce different results, and states that different results do not necessarily mean that one methodology is distortive. *See* Def.'s Brief at 16.  The Government pointedly observes that there would be little point in seeking to use a *new* methodology if that methodology could be used only if its results mirrored those of Commerce's default methodology. *See* Def.'s Brief at 16.  In sum and substance, U.S. Steel is arguing that the results produced by the payroll methodology are different from those produced by the relative sales value methodology.  But that the results are different does not necessarily mean that they are wrong.  As the Government puts it, "U.S. Steel's reliance upon expected differences rather than pointing out flaws in POSCO's methodology is not a valid argument." *See* Def.'s Brief at 16.

---

[18]Specifically, the payroll methodology yielded an indirect selling expenses ratio of [   ]%, while the relative sales value methodology results in a ratio of [    ]%. *See* Pl.'s Brief at 17; Pl.'s Reply Brief at 5.

U.S. Steel's invocation of Clinker from Mexico is also unavailing. In Clinker from Mexico, Commerce concluded that a particular alternative methodology was not distortive, because it produced results similar to those produced by the agency's default "relative sales value" methodology. *See* Clinker from Mexico, 2003 WL 24153862, at comment 15. But, contrary to U.S. Steel's claims, it does not logically follow that a difference in results between methodologies automatically renders an alternative methodology distortive. *See* Def.'s Brief at 16. Otherwise, "there would be no purpose in allowing alternative methodologies." *Id*.

Obviously, Commerce was aware of the difference in results between the payroll methodology that it used in the Final Results and the relative sales value methodology, which was used in the Preliminary Results. As outlined above, Commerce's decision to use the payroll methodology cannot be said to have been unreasonable. By using the payroll methodology here, Commerce properly sought to exclude from the calculation of indirect selling expenses those payroll and common expenses that were attributable to POSAM's sales of non-subject merchandise, as well as its management of investments (its non-selling activities). In contrast, if Commerce had used the relative sales value methodology here, the calculation of indirect selling expenses would have included both expenses related to sales of non-subject merchandise and expenses related to POSAM's non-selling activities. *See generally* POSCO Brief at 18-19.

To be sure, POSCO's indirect selling expenses ratio would have been higher had it been calculated using the relative sales value methodology, as U.S. Steel advocates. But U.S. Steel has advanced no argument or evidence to indicate that the mere difference in results between the methodologies renders the payroll methodology distortive in this case.

2.  Disproportionate Allocation of ISEs to Non-Subject Merchandise

According to U.S. Steel, "[t]he fact that the payroll methodology allocates [indirect selling expenses] disproportionately to [non-subject merchandise] is another factor that illustrates its distortive nature."  *See* Pl.'s Brief at 17-18 (final alteration in the original) (*citing* Issues and Decision Memorandum for the Antidumping Duty Administrative Review on Stainless Steel Wire Rod from Spain – March 5, 1998 through August 31, 1999, 2001 WL 171180 (Feb. 21, 2001) ("Wire Rod from Spain"), at comment 2 (stating that "satisfactory explanations to questions regarding possible distortions are particularly important given that [the alternative methodology] allocates indirect selling expenses disproportionately between [subject] and non-subject merchandise")).[19]

Specifically, U.S. Steel contends that – because sales of non-subject merchandise constituted only a certain percentage of POSAM's total sales – the extent of the indirect selling expenses allocated to those sales by Commerce was disproportionate, indicating that the payroll methodology is distortive.  *See* Pl.'s Brief at 17-18; Pl.'s Reply Brief at 2-3, 5, 10-11.[20]  However, U.S. Steel again

_____

[19]*See also* Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. 27,296, 27,348 (May 19, 1997) (Preamble) (stating that an allocation method that includes non-subject merchandise is distortive when expenses are "incurred . . . disproportionately on the out-of-scope or the in-scope merchandise" – but also emphasizing that "there is no basis for irrebuttably presuming such disproportionality without regard to the facts of a specific case") (*cited in* Pl.'s Brief at 17-18).

[20]In particular, U.S. Steel notes that the payroll methodology allocated [   ]% of POSAM's indirect selling expenses to sales of non-subject merchandise, even though such sales constituted only [   ]% of the company's total sales. *See* Pl.'s Brief at 18; Pl.'s Reply Brief at 10-11. U.S. Steel contrasts that observation with the fact that the payroll methodology allocated only [   ]% of the indirect selling expenses to sales of subject merchandise, which make up [   ]% of total sales. *See* Pl.'s Reply Brief at 11.

fails to demonstrate that the different results from the payroll methodology are impermissible or erroneous.

As the Government points out, U.S. Steel's reliance on Wire Rod from Spain is simply misplaced. *See* Def.'s Brief at 17; Pl.'s Brief at 17 (*quoting* Wire Rod from Spain, 2001 WL 171180, at comment 2). The facts of that case are very different from the facts here.

In Wire Rod from Spain, a respondent based its proposed allocation methodology upon the hours that its employees worked. *See* Wire Rod from Spain, 2001 WL 171180, at comment 2. However, the respondent could not verify that the hours that it had reported to Commerce were correct. *See id.* Because Commerce concluded that those data were "at the heart of [the respondent's] allocation methodology," and because Commerce found them to be inaccurate, Commerce rejected the respondent's proffered methodology. *See id.*

In contrast, as the Government observes, here there is no claim – by U.S. Steel, or anyone else – that POSAM's payroll data are in any way inaccurate. *See* Def.'s Brief at 17. Nor has U.S. Steel identified any particular flaw in the payroll methodology as it was used in this case, except to assert generally that the results of that methodology appear to be disproportionate. *See* Def.'s Brief at 17. Unlike Wire Rod from Spain, Commerce in this case was satisfied that POSCO's alternative allocation methodology – using POSAM's uncontested payroll data – was not distortive. *See* Def.'s Brief at 17; *see also* sections III.A & III.B.2, *supra* (analyzing and rejecting, on the merits, U.S. Steel's claim of distortion based on the mere fact that POSAM's sales of non-subject merchandise constituted only a certain percentage of its sales, a figure that U.S. Steel seeks to contrast sharply

with the percentage of indirect selling expenses allocated to those sales).  U.S. Steel's criticisms thus cast no doubt on either Commerce's methodology or the Final Results in this case.

### 3.  Relationship Between Nature of Expenses and Their Allocation

The third and final factor which U.S. Steel contends is "normally considered and applied by [Commerce] itself in determining the appropriateness of an alternative allocation methodology" is whether common expenses are allocated in "direct relation to the manner in which [they were] incurred."  *See* Pl.'s Brief at 18 (*quoting* Micron Technology, 23 CIT at 62, 44 F. Supp. 2d at 223 (approving alternative allocation methodologies where each bore "a direct relation to the manner in which the common expense [was] incurred")); *see also* Pl.'s Reply Brief at 2-3, 5, 12-14.

U.S. Steel argues that, in using the payroll methodology here, Commerce's allocation of POSAM's common expenses "bears no relation to the manner in which such expenses were incurred."  *See* Pl.'s Brief at 18; *see also* Pl.'s Reply Brief at 2-3, 12, 14.  In an attempt to illustrate its point, U.S. Steel singles out one particular type of expense included among POSAM's common expenses, and argues that "nothing in the administrative record even remotely suggests" that this particular type of expense "increased as POSAM's payroll increased."  *See* Pl.'s Reply Brief at 12; *see also* Pl.'s Brief at 18.[21]  But, significantly, U.S. Steel does not contend that Commerce's default methodology – the relative sales value methodology – would allocate that particular type of expense in "relation to the manner in which such expenses were incurred."  *See* Pl.'s Brief at 18.  Nor could U.S. Steel honestly make such a claim.

---

[21]U.S. Steel focuses specifically on repair and maintenance expenses.  *See* Pl.'s Brief at 18; Pl.'s Reply Brief at 12.

Although it is true that – as U.S. Steel asserts – the particular type of expenses that U.S. Steel cites as an example does not necessarily directly "increase[ ] as . . . payroll increase[s]," the same thing can be said of relative sales value: The particular type of expenses that U.S. Steel cites as an example also does not necessarily increase as sales increase. In short, the asserted infirmity that U.S. Steel highlights in the payroll methodology plagues the relative sales value methodology as well (and, indeed, is an issue that is largely inherent in the nature of common expenses and in the process of allocation). U.S. Steel thus has failed to identify a flaw specific to the payroll methodology, or its use in this case, which would be cured by the use of the methodology that U.S. Steel advocates.

Even more fundamentally, there is no truth to the basic premise of U.S. Steel's argument – that is, U.S. Steel's claim that an alternative allocation methodology is legally permissible only if all indirect selling expenses are allocated in a way that bears "a direct relation" to the nature of those expenses. In support of that proposition, U.S. Steel points to Micron Technology, 23 CIT at 62, 44 F. Supp. 2d at 223. See Pl.'s Brief at 18; Pl.'s Reply Brief at 12. But U.S. Steel misinterprets the case.

The Micron Technology court concluded that the three allocation methodologies proposed by the respondent during the administrative review there at issue were "more appropriate" than Commerce's default methodology, because each of the alternative methodologies bore "a direct relation to the manner in which the . . . expense [at issue was] incurred." See Micron Technology, 23 CIT at 62, 44 F. Supp. 2d at 223. As the Government here explains, however, "[t]his does not mean that a methodology that does not bear a direct relationship with the way an expense is incurred

is distortive. Indeed, under U.S. Steel's interpretation, any alternative methodology, other than a methodology that allocates *each type of expense in a separate manner according to the way in which that expense was incurred*, would be distortive." *See* Def.'s Brief at 17-18 (emphasis added).

U.S. Steel thus engages in the same sort of faulty logic that characterized its analysis of Clinker from Mexico, discussed in section III.B.1, above. That the alternative methodologies at issue in Micron Technology bore "a direct relation to the manner in which . . . [the expenses at issue were] incurred" may have been *sufficient* to warrant the approval of those methodologies in *the specific case* there before the court. But that is not to say that such a "direct relation" is *necessary* in *this case*, much less *all cases*, as U.S. Steel maintains. *See* Pl.'s Brief at 18 (*quoting* Micron Technology, 23 CIT at 62, 44 F. Supp. 2d at 223).[22]

---

[22]Finally, as the Government emphasizes, "Commerce has accepted indirect selling expense allocation methodologies similar to POSCO's in previous reviews." *See* Def.'s Brief at 18 (*citing* Issues Memorandum for the Antidumping Duty Investigations of Steel Concrete Reinforcing Bars from the Republic of Korea, 2001 WL 708441 (June 22, 2001), at comment 2 (finding the salary methodology "based on the ratio of total salaries to the salaries of personnel responsible for domestic sales, export sales, and G&A activities. . . . reasonable."); Issues and Decision Memorandum for the Final Determination of the Investigation of Prestressed Concrete Steel Wire Strand from Mexico, 2003 WL 24153876 (Dec. 8, 2003), at comment 2 (where indirect selling expense methodology was "based on the number of employees involved in the sales process of the product"); Issues and Decision Memorandum for the Administrative Review of Stainless Steel Sheet and Strip in Coils From the Republic of Korea for the Period of Review ("POR") January 4, 1999 through June 30, 2000, 2001 WL 1692844 (Dec. 17, 2001) ("Stainless Steel from Korea"), at comment 15 (applying a methodology "based on either the number of employees performing a given function, or the level of salaries and bonuses (for salary type expenses)"); *see also* POSCO Brief at 14.

U.S. Steel seizes on Stainless Steel from Korea (one of the cases that the Government cites), and argues that payroll information was used there only to allocate "*salary type expenses*." *See* Pl.'s Reply Brief at 13-14 (*quoting* Stainless Steel from Korea, 2001 WL 1692844, at comment 15 (emphasis added by Plaintiff)). What U.S. Steel neglects to note is that the remaining indirect selling expenses in that case were allocated in accordance with "the number of employees performing a given function" – *not* the relative sales value methodology that U.S. Steel advocates

In sum, like the other two factors which U.S. Steel contends are "normally considered and applied by [Commerce] itself in determining the appropriateness of an alternative allocation methodology," this third and final factor – the relationship between the nature of expenses and their allocation – also does not advance U.S. Steel's case.[23]

## C. Commerce's Change of Methodology

Lastly, U.S. Steel faults Commerce for changing the methodology used by the agency to allocate POSAM's indirect selling expenses. *See generally* Pl.'s Brief at 11-12, 13. U.S. Steel emphasizes that Commerce used the relative sales value methodology in prior administrative reviews involving POSCO, and, indeed, that POSCO itself advocated the use of that methodology in the tenth administrative review. *See* Pl.'s Brief at 11-12. In addition, U.S. Steel seeks to make much of the fact that Commerce used the relative sales value methodology in the Preliminary Results in the administrative review at issue here. *See* Pl.'s Brief at 13. U.S. Steel argues that Commerce "changed allocation methodologies between the preliminary and final results not based on any new evidence, but based on documents that were provided to the [agency] well before the

_____

here. *See* Stainless Steel from Korea, 2001 WL 1692844, at comment 15. Moreover, U.S. Steel fails to explain how allocating indirect selling expenses in accordance with "the number of employees performing a given function" bears a more "direct relation to the manner in which the allocated expenses were incurred" (relative to the payroll methodology), as U.S. Steel claims it does. *See* Pl.'s Reply Brief at 14.

[23]U.S. Steel appears to argue in the alternative that – even assuming that none of the three alleged factors that it identifies is sufficient to carry the day – "the three factors *considered as a whole* conclusively demonstrate that the payroll methodology is distorted." *See* Pl.'s Reply Brief at 5 (emphasis added); *see also id.* at 6. As set forth here in section III.B, none of the three asserted factors supports U.S. Steel's case. And this is one instance where the whole is no greater than the sum of its parts.

preliminary results," and that the documents therefore cannot justify Commerce's decision to change methodologies for the Final Results. *See* Pl.'s Brief at 13; *see also id.* at 6.

Contrary to U.S. Steel's implication, the mere fact of Commerce's use of the relative sales value methodology in prior administrative reviews did not obligate the agency to continue to use that methodology for all future reviews. *See generally* POSCO Brief at 19-20. It is well-established that Commerce is required to calculate antidumping duty margins as accurately as possible in each segment of a proceeding. *See*, *e.g.*, Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Moreover, there is no requirement that Commerce use the same methodologies in every segment. *See*, *e.g.*, Huvis Corp. v. United States, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (rejecting argument that "law of the proceeding" obligated Commerce to apply methodology as it had been applied in three previous administrative reviews; "Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology"). Commerce's regulations expressly mandate that the agency calculate allocated expenses on as specific a basis as possible, which was the goal of POSCO and Commerce in using the payroll methodology to calculate POSAM's indirect selling expenses for purposes of the Final Results in the twelfth administrative review, at issue here. *See* 19 C.F.R. § 351.401(g)(2).

Further, there was a key change in POSCO's operations between the periods covered by prior administrative reviews and the period covered by this review. *See* POSCO Brief at 20.[24]

---

[24]Specifically, during the period covered by the tenth administrative review, a substantial portion of POSAM's expenses related to sales to POSAM's subsidiaries. *See* Issues and Decisions for the Final Results of the Antidumping Duty New Shipper Review and the Antidumping Duty Administrative Review of Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Tenth Administrative Review (2002-2003), 2005 WL 2290629 (March 14, 2005), at

Particularly given the different facts in the twelfth administrative review, it was not unreasonable for Commerce to use a different allocation methodology, to seek to achieve a more specific and more accurate indirect selling expenses ratio.

U.S. Steel's complaint that Commerce switched methodologies between the Preliminary Results and the Final Results in this administrative review is no more well-founded. *See generally* POSCO Brief at 20-21. It has long been recognized that Commerce is not bound by the positions taken or the methodologies employed in its preliminary determinations. *See*, *e.g.*, Peer Bearing Co. v. United States, 22 CIT 472, 481-82, 12 F. Supp. 2d 445, 456 (1998) (explaining that "Commerce is allowed flexibility to change its position from the preliminary determination to the Final Results, as long as Commerce explains the basis for the change and the explanation is supported by substantial evidence. . . . Preliminary results, by their very nature, are preliminary and subject to change."). As POSCO notes, "the whole purpose of the [post-Preliminary Results] briefing process is to permit parties an opportunity to address aspects of Commerce's preliminary calculation methodology and attempt to convince Commerce to make appropriate revisions in the final decision." *See* POSCO Brief at 21.

In this case, as U.S. Steel emphasizes, Commerce had the requisite documentation in hand before the Preliminary Results issued. *See* Pl.'s Brief at 6, 13. Nevertheless, because Commerce had not yet had an opportunity to digest that information or to carefully analyze POSCO's proposed payroll methodology, the agency relied on its default methodology – the relative sales value

---

comment 11; Tr. at 27-28. In contrast, there were no such sales during the period covered by the administrative review at issue here. *See* POSCO Brief at 20; Tr. at 27-28. POSAM's activity vis-a-vis the subsidiaries was limited to investment management. *See* Tr. at 27-28.

methodology – for purposes of the Preliminary Results. *See* Def.'s Brief at 3-4, 11; *see also* Decision Memorandum at 45. After the Preliminary Results were released, Commerce reviewed POSCO's proposal more carefully, and considered it in light of the parties' briefing. As the Government explains, "after analyzing POSCO's explanation of the methodology in its case brief and after reviewing the evidence from the original and supplemental questionnaires, Commerce was satisfied that POSCO's methodology was accurate for the Final Results." *See* Def.'s Brief at 11; *see also id*. at 4; Decision Memorandum at 45. U.S. Steel's objections to Commerce's change of methodology must therefore be rejected.

## IV. Conclusion

For all the reasons set forth above, Commerce's well-reasoned decision – based on the specific facts of this case – to exclude POSAM's "investment management" expenses from the pool of indirect selling expenses and to allocate those expenses based on payroll data (rather than relative sales value) was supported by substantial evidence and otherwise in accordance with law.

U.S. Steel's Motion for Judgment on the Agency Record therefore must be denied, and the U.S. Department of Commerce's Notice of Final Results of the Twelfth Administrative Review of the Antidumping Duty Order on Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea, 72 Fed. Reg. 13,086 (March 20, 2007), as amended at 72 Fed. Reg. 20,815, 20,816 (April 26, 2007), must be sustained.

Judgment will enter accordingly.

/s/ Delissa A. Ridgway
_____
Delissa A. Ridgway
Judge

Decided: March 19, 2010
          New York, New York